# SHAREHOLDERS' AGREEMENT

AGREEMENT, made as of the 1st day of January, 2003, by and among SUSAN TEEMAN ("TEEMAN"), residing at 910 Fifth Avenue, Apt. 3B, New York, New York 10021; MARYBETH GILMARTIN ("GILMARTIN"), residing at 237 Lake Avenue, Greenwich, Connecticut 06830 (TEEMAN and GILMARTIN are collectively the "SHAREHOLDERS" and individually each is a "SHAREHOLDER"); and TEEMAN PERLEY GILMARTIN INC. ("CORPORATION"), a New York corporation with an office at 230 Park Avenue, Suite 2425, New York, New York 10169.

## WITNESSETH:

WHEREAS, the SHAREHOLDERS are the owners of all of the issued and outstanding shares of capital stock of the CORPORATION (shares of the CORPORATION's capital stock issued and outstanding from time to time, the "Stock");

WHEREAS, it is the desire of the parties to make certain agreements regarding management of the CORPORATION, the restrictions and terms relating to the sale of Stock and certain other matters, all on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and premises hereinafter set forth, the parties hereto hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms and phrases used in this Agreement and not otherwise defined in this Agreement shall have the respective meanings set forth on Exhibit A to this Agreement which is hereby incorporated into and forms a part of this Agreement.

## ARTICLE II
## MANAGEMENT AND CERTAIN AGREEMENTS REGARDING THE CONDUCT OF BUSINESS

2.1. **Management.**

(a) Subject to the balance of this Section 2.1(a), the Board of Directors of the CORPORATION shall be composed of two persons, consisting of the SHAREHOLDERS for as long as both are shareholders of the CORPORATION. Subject to the balance of this Section 2.1(a), each of the SHAREHOLDERS hereby agrees to vote all of her shares of Stock from time to time for the election of the SHAREHOLDERS (for as long as both are shareholders of the CORPORATION) as the sole directors of the CORPORATION. If either SHAREHOLDER is no longer a shareholder of the CORPORATION, she shall immediately resign as a director. Notwithstanding the foregoing, if any SHAREHOLDER is a shareholder of the CORPORATION and suffers a Disability which makes her incapable of serving as a director of the CORPORATION, the incapable SHAREHOLDER shall cease serving as such and she shall immediately resign as a director of the CORPORATION and each of the SHAREHOLDERS shall thereafter vote all of her shares of Stock from time to time for the election of the capable, non-disabled director as the sole director of the CORPORATION in any such case. If either SHAREHOLDER refuses to so or fails to so resign when required by this Section 2.1(a), she hereby grants the other SHAREHOLDER an irrevocable power of attorney, which is coupled with an interest, to execute and deliver said resignation in a form satisfactory to the remaining shareholder.

(b) For as long as she is a shareholder of the CORPORATION, TEEMAN shall be appointed to hold the offices of the CORPORATION of President and Secretary until her successor is

[709472-2]　　　　　　　　　　　　　　1　　　　　　　　　　　　　Draft 1/23/04

3.2. <u>Investment.</u>

(a) Each of the SHAREHOLDERS hereby agrees and understands that she has acquired the Stock for investment purposes only and not for sale or with a view to distribution of all or any part of such Stock.

(b) Each of the SHAREHOLDERS hereby agrees and understands that the Stock she has received and may receive in the future has not been and will not be registered under the Securities Act of 1933 (the "1933 Act"), or under the securities laws of any U.S., state or other jurisdiction, and has been or will be received by her pursuant to a specified exemption from the registration provisions thereunder.

(c) Each of the SHAREHOLDERS hereby agrees and acknowledges that the Stock that she has received and that she may in the future receive must be held indefinitely unless such Stock is subsequently registered under the 1933 Act and under applicable state securities laws or an exemption from such registration is available and unless a transfer is made in accordance with the terms of this Agreement.

(d) Each of the SHAREHOLDERS hereby agrees that she is aware that no federal or state or other agency has passed upon or made any finding or determination concerning the fairness of the transactions contemplated by this Agreement or any of the related agreements and instruments or the adequacy of any disclosure made to such SHAREHOLDER.

## ARTICLE IV
## OWNERSHIP OF STOCK BY SHAREHOLDERS

Each of TEEMAN and GILMARTIN owns 100 shares of the CORPORATION's Stock.

## ARTICLE V
## VOLUNTARY AND INVOLUNTARY LIFETIME TRANSFERS

5.1. <u>Transfer of Stock.</u> During the term of this Agreement, neither SHAREHOLDER shall, directly or indirectly, sell, assign, hypothecate, transfer, pledge, encumber, give, place in trust, or otherwise voluntarily or involuntarily dispose of, by will or otherwise, any Stock or any portion thereof ("transfer") except as expressly and specifically permitted by this Article V of this Agreement, subject to the requirements and conditions contained in this Article V. The CORPORATION shall refuse to transfer on its books any Stock transferred by either SHAREHOLDER in violation of this Agreement.

5.2. <u>Restrictive Endorsement.</u> Each certificate representing either SHAREHOLDER's Stock shall have printed thereon the following legend:

These shares have not been registered under the Securities Act of 1933, as amended ("1933 Act") and have been acquired for investment and shall not be sold, assigned, hypothecated, transferred, pledged, encumbered, gifted, placed in trust or otherwise voluntarily or involuntarily disposed of without an effective registration statement for the shares under the 1933 Act or a valid exemption therefrom and compliance with the Shareholders' Agreement referred to below which restricts any such sale, assignment, hypothecation, transfer, pledge, encumbrance, gift, placement or disposition. The sale, assignment, hypothecation, transfer, pledge, encumbrance, gift, placement and disposition of these shares is subject to a Shareholders' Agreement dated as of January 1, 2003, as amended, modified, supplemented or restated from time to time, a signed counterpart of which is on file at the office of the CORPORATION.

5.3. <u>Options and/or Obligations to Purchase Stock.</u> In the event a Triggering Event occurs with respect to either SHAREHOLDER, the other SHAREHOLDER shall purchase all Stock of the SHAREHOLDER suffering the Triggering Event for $1.

5.4. <u>Time and Place of Closing.</u> The closings under this Agreement for the sale of Stock shall take place at the time and place designated by the buying SHAREHOLDER in her sole and absolute discretion but in no event shall any closing take place more than 90 days after the relevant Triggering Event.

5.5. <u>Transfer of Title.</u> At the closing for any purchase of Stock, title to the Stock shall pass immediately at closing upon the making of the initial payment required under this Article V.

5.6. <u>Indemnification.</u> Acceptance by any SHAREHOLDER or her estate, representatives or heirs of all or part of any consideration for a sale of her Stock shall constitute an agreement by such SHAREHOLDER to indemnify the CORPORATION and the remaining SHAREHOLDER from and against (a) the selling SHAREHOLDER's proportionate share of any and all claims or liabilities which may arise subsequent to the date of closing with respect to taxes of any kind or nature found to be due by the CORPORATION to the United States or any State or municipality for any periods prior to closing and (b) the selling SHAREHOLDER's gross negligence or intentional wrongful conduct or any claims, adverse claims, encumbrances, pledges, security interests and liens (the "Liens") on her Shares and all liabilities, damages, losses, costs and expenses, including, without limitation, attorneys' fees and expenses, caused by any such gross negligence or wrongful conduct or Liens. It is understood and agreed that the selling SHAREHOLDER's liability under Section 5.7(a) shall be limited to such proportion of such claims and liabilities as is equivalent to her Stock Percentage Interest in the CORPORATION for the applicable period prior to closing multiplied by the applicable liability (which should include a pro-ration if the sale takes place prior to the expiration of a taxable period). At closing, to the extent not previously provided, the selling SHAREHOLDER shall resign as a director and officer of the CORPORATION and represent and warrant in a separate writing to the purchaser of the Shares that they are free and clear of all Liens and that she has not acted with gross negligence or intentionally wrongfully and that she shall indemnify the buying SHAREHOLDER and the CORPORATION from her gross negligence or wrongful conduct and all Liens and all liabilities, damages, losses, costs and expenses, including, without limitation, attorney's fees and expenses, cause by any such gross negligence or wrongful conduct or Liens.

5.7. <u>Outstanding Loans.</u>

(a) In the event that either SHAREHOLDER sells her Stock pursuant to this Agreement and in the event that at the time of the closing the CORPORATION or the other SHAREHOLDER is indebted to the selling SHAREHOLDER for any loans made to the CORPORATION or the other SHAREHOLDER or other financial obligations, the CORPORATION or the other SHAREHOLDER, as applicable (whichever is liable), shall repay said indebtedness and such other obligations to the selling SHAREHOLDER with interest, if applicable (less the amount of any loans made by the CORPORATION or the other SHAREHOLDER, as applicable, to the selling SHAREHOLDER, plus interest, if applicable) at closing.

(b) In the event either SHAREHOLDER sells or transfers her Stock pursuant to this Agreement, the other SHAREHOLDER shall use reasonable best efforts to have the selling/transferring SHAREHOLDER released from any personal guarantees of the CORPORATION's obligations. Regardless of whether any such release is obtained, upon any such sale or transfer, the selling or transferring SHAREHOLDER shall be indemnified for any and all losses, liabilities, damages and expenses, including, without limitation, attorneys' fees, resulting from or relating to such guarantees.

JAN 23 2004 15:41 FR TANNENBAUM HELPERN 212 371 1084 TO 12123701518   P.05

## ARTICLE VI
### CONFIDENTIAL INFORMATION, TRADE SECRETS, EXCLUSIVE SERVICES

So long as either SHAREHOLDER is a shareholder of the CORPORATION, except in furtherance of the CORPORATON's business, such SHAREHOLDER shall not, either directly or indirectly, on her own behalf or in the service or on behalf of others, engage in any other business, enterprise or business-related undertaking, or prepare for, undertake or discuss with any employees of the CORPORATION any other business or professional employment of any kind, whether within the personnel or staffing industries or otherwise. [Exceptions?]

So long as either SHAREHOLDER is a shareholder of the CORPORATION and thereafter, such SHAREHOLDER shall neither use, disclose, copy, retain nor remove from the CORPORATION's premises any confidential or proprietary information or trade secrets, including but not limited to lists and information pertaining to clients and client contacts, job applicants, referrals, and employees, and all other ideas, methods, procedures, techniques, written material, data, strategic or marketing plans, and other know-how, developed or used in connection with the CORPORATION's business or otherwise belonging or pertaining to the CORPORATION (collectively, as modified by the balance of this Article VI, "Confidential Information") other than in connection with and in furtherance of authorized work performed for the CORPORATION. Confidential Information shall also include but not be limited to, the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and resumes of all persons who have applied to or been recruited by the CORPORATION for employment, job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the CORPORATION, information relating to trademarks, service marks, patents, patent applications, discoveries, copyrights, and other proprietary rights, existing and potential sources, services or arrangements, commission structures, business projections and forecasts, policies and strategies, operating methods, information stored on the CORPORATION's computers or in the CORPORATION's files, the internal organization of the CORPORATION and any other matters relating to the business of the CORPORATION that are not publicly known, and any information the disclosure of which may adversely affect the financial condition, good name, reputation or image of the CORPORATION or its business. All information stored on these computers, including e-mail, word processing documents or other data, whether or not the information relates to the CORPORATION, is the property of the CORPORATION. As an employee of the CORPORATION, each SHAREHOLDER is forbidden from storing Confidential Information on personally-owned computers.

Upon termination or cessation of any SHAREHOLDER's employment and also on any date she ceases to be a shareholder of the CORPORATION, such SHAREHOLDER shall turn over to the CORPORATION all documents, papers, digital data and other material, including all copies thereof (in any form or on any medium whatsoever, including without limitation, on any computer hard drive or any personal computers), in her possession or under her control which may constitute, contain or be derived from Confidential Information, together with all documents, notes or other work product which is connected with or derived from such SHAREHOLDER's services to the CORPORATION whether or not such material is at the date thereof in such SHAREHOLDER's possession.

Neither SHAREHOLDER shall be liable for disclosing Confidential Information to the extent such disclosure is required by applicable law provided that the SHAREHOLDER required to make such disclosure notifies the other SHAREHOLDER as soon as reasonably possible after learning of such requirement and does not interfere with the other SHAREHOLDER's or the CORPORATION's attempt to prevent such disclosure.

To the extent of any direct conflict between this Article and Section 13.2, Section 13.2 shall control.

## ARTICLE VII
## NON-SOLICITATION

Each SHAREHOLDER shall not, while a shareholder of the CORPORATION and for a period of the first two (2) years commencing on the date she ceases to be a shareholder of the CORPORATION (for any reason), either directly or indirectly, on her own behalf or in the service or on behalf of others:

(a) Solicit, divert or hire or cause to be hired, or attempt to solicit, divert, hire or cause to be hired, to or by any Competing Business, or hire or engage as an independent contractor or otherwise, any Person employed by or acting as a consultant to the CORPORATION (any such employee or consultant, a "Prohibited Employee"), at any time while such SHAREHOLDER was a shareholder or employee of the CORPORATION, or at any time during the two (2) year period after such SHAREHOLDER ceases to be a shareholder, whether such Prohibited Employee is or was employed as a temporary or permanent employee and whether or not such employment or consultancy is or was pursuant to a written agreement and whether or not such employment or consultancy is or was for a determined period or is or was at will or induce or seek to influence any Prohibited Employee to leave his/her employer (or terminate such consultancy with the CORPORATION), or to become financially interested in a business similar to that of the CORPORATION.

(b) Solicit, divert, induce or influence, or attempt to solicit, divert, induce or influence any Person who was a client of the CORPORATION prior to either SHAREHOLDER becoming a shareholder or an employee of the CORPORATION, or any Person who was, is or will be a client of the CORPORATION while such SHAREHOLDER is a shareholder or employee of the CORPORATION, or during the two (2) year period after such SHAREHOLDER ceases to be a shareholder, or fill, or attempt to fill, a job order or assignment which was obtained and pending with the CORPORATION, at the time such SHAREHOLDER ceased being a shareholder of the CORPORATION, or encourage any such Person to terminate a relationship with the CORPORATION or transact business with a Competing Business; or

(c) Contact, circularize or communicate with, in any manner, directly or indirectly, any of the CORPORATION's applicants for permanent employment who were such at the time such SHAREHOLDER is, was or will be a shareholder or employee of the CORPORATION or during the two (2) year period after such SHAREHOLDER ceases to be a shareholder.

Each SHAREHOLDER agrees that while she is a shareholder of the CORPORATION, that she will not, either directly or indirectly, on her own behalf or in the service or on behalf of others, engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business; provided, however, such SHAREHOLDER may own up to two percent (2%) of any publicly-held company where such SHAREHOLDER is a mere owner and not otherwise connected to such publicly-held company.

## ARTICLE VIII
## NON-AFFILIATION

Each SHAREHOLDER shall not, while a shareholder or employee of the CORPORATION and for a period of the first two (2) years commencing on the date she ceases to be a shareholder of the CORPORATION (for any reason), directly or indirectly, accept employment with an employer which employs any Person who was, is or will be an employee of the CORPORATION while such SHAREHOLDER was, is or will be a shareholder or employee of the CORPORATION.

JAN 23 2004 15:42 FR TANNENBAUM HELPERN 212 371 1084 TO 12123701218    P.07

## ARTICLE IX
## BREACH

(a)  In the event of a breach of any of the covenants set forth in Articles VI, VII or VIII the running of the period of the restriction shall be tolled during the continuation of any such breach, and the running of the period of such restrictions shall commence only upon compliance with the terms of the applicable Section. The CORPORATION agrees to notify such SHAREHOLDER of her breach of any covenants set forth in Articles VI, VII or VIII within fourteen (14) days of discovery of such breach by the CORPORATION, but failure to notify such SHAREHOLDER of such breach shall not be a waiver of any rights of the CORPORATION with respect thereto.

(b)  Each SHAREHOLDER agrees that each of her covenants set forth in Articles VI, VII or VIII are reasonable and necessary to protect and preserve the CORPORATION's business, interests and properties of the CORPORATION, and in the event of a breach of any of his covenants in this Agreement, the CORPORATION and each of the SHAREHOLDERS, shall be entitled to both temporary and permanent injunctions to prevent a breach or contemplated breach of any of such covenants in Articles VI, VII or VIII of this Agreement, without the necessity of proving irreparable harm or posting a bond or other security. The SHAREHOLDERS and/or the CORPORATION also retain the right to seek other relief, including damages for a breach of this Agreement.

(c)  The remedies contained herein are not exclusive, but are cumulative, and the CORPORATION and the SHAREHOLDERS may pursue any and all other relief available to any of them in equity or in law.

## ARTICLE X
## PATENTS, COPYRIGHTS

Any and all intellectual property and other proprietary rights and interests in all work products, including, without limitation, all patents, patent applications, inventions, copyrights, developments, trade secrets and process (together with all modifications and derivatives thereof, collectively "Inventions") which either SHAREHOLDER may own, produce, conceive of, create or develop while a shareholder or employee of the CORPORATION relating to the fields in which the CORPORATION may then be engaged, shall belong to and be the sole and exclusive property of the CORPORATION; and forthwith upon request of the CORPORATION, either SHAREHOLDER shall execute all such assignments and other documents and take all such other action as the CORPORATION may reasonably request in order to vest in the CORPORATION all her right, title, and interest in and to such Inventions, free and clear of all liens, charges, and encumbrances. To the extent of any direct conflict between this Article and Section 13.2, Section 13.2 shall control.

## ARTICLE XI
## EFFECTIVE DATE, TERMINATION

(a)  This Agreement shall be deemed effective as of the date first above set forth and shall terminate (except with respect to any right, option or obligation created or arising hereunder by virtue of the occurrence of any event prior to the termination of this Agreement, whether or not any such right, option or obligation shall be continued or dependent on the lapse of any period of time, the giving of any notice or the occurrence of any other event after the termination of this Agreement) on the occurrence of the earliest of: (i) agreement of the SHAREHOLDERS; (ii) the merger or consolidation of CORPORATION with or into any other CORPORATION not directly or indirectly owned or controlled by the SHAREHOLDERS; (iii) closing of an Initial public offering of CORPORATION's shares of Stock; or (iv) the acquisition by either SHAREHOLDER or CORPORATION of all of the Stock owned by the other SHAREHOLDER.

(b) Notwithstanding the provisions contained in this Agreement, upon termination of this Agreement, Articles VI, VII, VIII, IX, X, XI, XII and XIII and Exhibit A shall survive and shall remain binding on the parties to this Agreement.

ARTICLE XII
FURTHER DOCUMENTS, BOOKS AND RECORDS TO BE RETURNED

All books, records and accounts relating to CORPORATION's affairs, whether prepared by either SHAREHOLDER or otherwise coming into either SHAREHOLDER's possession, shall be the exclusive property of CORPORATION and shall be returned immediately to CORPORATION on termination of this Agreement or at CORPORATION's request at any time.

ARTICLE XIII
MISCELLANEOUS PROVISIONS

13.1. Notices. All notices, demands, requests, consents or other communications to be made, served or given pursuant to the terms hereof shall be in writing and signed by the party giving the same and shall be deemed given or made within one (1) Business Day of dispatch if transmitted by a reputable overnight courier or if delivered by hand to the intended recipient at the address as set forth in the preamble to this Agreement. Any party may change the address to which each such notice or communication shall be sent by giving written notice to the other parties hereto of such address in accordance with this Section.

13.2. Severability. The parties hereto intend all provisions of this Agreement to be enforced to the fullest extent permitted by law. The parties agree that each of the covenants and agreements in this Agreement is separate, distinct and severable from all of the other provisions of this Agreement; that the unenforceability of any such covenant or agreement shall not affect the validity or enforceability of any other such covenants or agreements or any other provision or provisions of this Agreement. Should a court of competent jurisdiction determine that the scope of any provision of Articles VI through X of this Agreement is too broad to be enforced as written, the parties intend that the court should reform the provision to such narrower scope as it determines to be enforceable. If, however, any provision of this Agreement is held to be illegal or unenforceable or by its severance, invalid or unenforceable under present or future law, and with respect to Articles VI through X not subject to reform, as set forth above, such provision shall be fully severable from this Agreement, this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision were never a part hereof and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance.

13.3. Captions. The captions set forth above in this Agreement are for convenience only and shall not limit or define the text of this Agreement.

13.4. Person and Gender. Until the context clearly requires a different interpretation, the masculine gender shall include the feminine and neuter genders, and the singular shall include the plural.

13.5. Binding Agreement. This Agreement and the parties' rights and obligations may not be assigned or transferred. Subject to the restrictions on assignment and transfer herein contained, the terms and provisions of this Agreement shall be binding upon the parties hereto and their respective successors, representatives, estates and assigns and inure to the benefit of, the successors, representatives, estates, heirs, legatees and permitted assigns of the respective SHAREHOLDERS. No Person other than a successor, representative, estate, heir, legatee or permitted assign of the SHAREHOLDERS shall obtain any benefit or have any right to enforce any provision of this Agreement.

JAN 23 2004 15:44 FR TANNENBAUM HELPERN 212 371 1084 TO 12123701218                    P.09

13.6. <u>Waiver of ...tion for Partition.</u> Each of the Parties irrevocably waives any right that it may have to maintain any action for partition with respect to the property of the CORPORATION.

13.7. <u>Non-Disparagement.</u> The parties hereto agree that they will not make, or cause to be made, any statements, observations or opinions, or communicate any information (whether oral or written) that disparage or are likely in any way to harm the reputation of each other except to the extent required or advisable in connection with any then pending litigation or governmental investigation.

13.8. <u>Applicable Law.</u> Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of New York without giving effect to conflict of law principles.

13.9. <u>Entire Agreement.</u> This Agreement, which includes Exhibit A to this Agreement, embodies the entire agreement of the parties hereto with respect of the matters set forth herein and therein and supersedes any prior understanding or agreements oral or written with respect thereto.

13.10. <u>Agreement in Counterparts.</u> This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement, binding on the parties thereto, notwithstanding that all the parties are not signatories to the original or same counterpart.

13.11. <u>Amendments.</u> This Agreement may only be amended, modified or restated by a written document signed by all parties.

13.12. <u>Appraisal Rights.</u> The SHAREHOLDERS hereby waive any appraisal, cash-out or similar rights they may have at law relating to any CORPORATION act, event or transaction, including, without limitation, any merger, sale or consolidation involving the CORPORATION.

13.13. <u>Waiver of Breach.</u> The waiver of any breach of this Agreement by any party at any time shall not be effective unless in writing, and no such waiver shall constitute the waiver of the same or another breach on a subsequent occasion.

13.14. [<u>Rights to Name "TEEMAN" and "GILMARTIN".</u> The SHAREHOLDERS agree that the names, trade names, service marks and trademarks utilized for the CORPORATION's business are and shall at all times be owned solely by the CORPORATION except that the names "TEEMAN" and "PERLEY" and all trade names, service marks or trademarks containing the formatives of TEEMAN and/or PERLEY (the "SHAREHOLDER Marks") are and shall at all times be owned by TEEMAN or PERLEY, as applicable. Each of the SHAREHOLDERS hereby grants the CORPORATION, and the CORPORATION hereby accepts, a royalty-free, non-exclusive, non-transferable license, without right to sub-license, to use the SHAREHOLDER Marks in connection with the CORPORATION's business, for as long as the CORPORATION does business (the "Name License"). At either SHAREHOLDER's request, on terms satisfactory to the SHAREHOLDERS, the CORPORATION shall execute a more extensive license agreement with such SHAREHOLDER replacing the Name License.]

13.15. <u>Arbitration; Submission to Jurisdiction.</u> Except as set forth below, all disputes arising in connection with this Agreement shall be resolved by binding arbitration in accordance with the applicable rules of the American Arbitration Association. The arbitration shall be held in New York, New York before a single arbitrator and shall otherwise be conducted in accordance with the American Arbitration Association Commercial Arbitration Rules. Each of the parties hereto hereby consents to the exclusive jurisdiction of any state or federal court located within the county of New York, State of New York in connection with any violation or alleged violation of Article VI through X of this Agreement. Each of the parties irrevocably agrees that all actions and proceedings relating to a violation or an alleged violation of Article VI through X of this Agreement hereby shall be litigated in New York County, New York. Each of the parties hereto waives any objection that it may have to the conduct of any action or

proceeding in any such arbitration or court based on improper venue or forum non conveniens, waives personal service of any and all process upon it, and consents that all service of process may be made by mail or courier service directed to it at the address set forth in this Agreement and that service so made shall be deemed to be completed upon the earlier of actual receipt or ten (10) days after the same shall have been posted. Nothing contained in this Section shall affect the right of any party hereto to enforce any judgment obtained by arbitration or in a New York court in any other court or serve legal process in any other manner permitted by law.

13.16. **Further Assurances.** Each of the parties shall cooperate and take such actions, and execute all such further instruments and documents, at any time, as any party may reasonably request to effect the terms and purposes of this Agreement.

13.17. **Certain Waivers.** EACH OF THE PARTIES HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT, HE OR SHE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY SUCH TRIAL SHALL BE CONDUCTED SOLELY BY A JUDGE OR AN ARBITRATOR, AS REQUIRED BY THIS AGREEMENT. EACH OF THE PARTIES CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHERS WOULD NOT, IN THE EVENT OF ARBITRATION OR LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS.

13.18. **Counsel Representation.** EACH PARTY AGREES AND ACKNOWLEDGES THAT HE OR SHE HAS BEEN REPRESENTED BY INDEPENDENT COUNSEL IN CONNECTION WITH THIS AGREEMENT OR BEEN ADVISED THAT HE OR SHE SHOULD BE REPRESENTED BY INDEPENDENT COUNSEL IN CONNECTION WITH THIS AGREEMENT. IF ANY PARTY DECIDED NOT TO BE REPRESENTED BY INDEPENDENT COUNSEL IN CONNECTION WITH THIS AGREEMENT, HE OR SHE IRREVOCABLY WAIVES ANY AND ALL DEFENSES OR RIGHTS ARISING OUT OF OR RELATED TO SAID DECISION. GERSH AGREES THAT MESTEL HAS DISCLOSED TO HIM, AND HIS ADVISORS, ALL RELEVANT FACTS NECESSARY TO PERMIT HIM TO MAKE A FULLY ENFORMED DECISION TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS COMPLETED THEREBY.

13.19. **Disability Examinations.** Each SHAREHOLDER hereby agrees to submit to reasonable examinations promptly upon request if the other SHAREHOLDER has reason to suspect a Disability or the Final Disability Threshold has occurred.

13.20. **SHAREHOLDER Loans.** TEEMAN has loaned the CORPORATION $492,000. GILMARTIN has loaned the CORPORATION $417,970. Such loans shall be paid back (with/without interest) on a pro rata basis to each SHAREHOLDER (based on the then outstanding principal balance of such loans) as cash becomes available, as determined by the CORPORATION's Board of Directors [but in all cases before the payment of any bonuses or dividends or other distributions to the SHAREHOLDERS.

IN WITNESS WHEREOF, this Agreement has been executed in New York, New York, as of the day and year first above written.

_____
SUSAN TEEMAN

_____
MARYBETH GILMARTIN

TEEMAN PERLEY GILMARTIN INC.

By: _____
Name:   Susan Teeman
Title:   President/Secretary

By: _____
Name:   Marybeth Gilmartin
Title:   Vice President

EXHIBIT A

"Aggregate Compensation" shall mean, during any year, with respect to either SHAREHOLDER, her salary, bonus, benefits, expenses, dividends and other distributions from the CORPORATION.

"Agreement" shall mean this Shareholders' Agreement, as it may be amended, modified, supplemented or restated from time to time.

"Competing Business" any business which is either engaged in the permanent placement of applicants in [fill in positions] or the same or substantially the same business as any business of the CORPORATION.

"CORPORATION" shall have the meaning set forth in the preamble.

"Disability" shall mean, with respect to any SHAREHOLDER, the inability to perform the services for the CORPORATION required by this Agreement or in connection with her employment for the CORPORATION due to physical or emotional or mental incapacity or illness for sixty (60) or more consecutive days or ninety (90) or more days in any twelve (12) consecutive months; provided, however, if the CORPORATION maintains any disability income insurance policy for any SHAREHOLDER, the definition of a disability in such policy shall apply in lieu of the foregoing definition. The determination as to whether a Disability has occurred shall be made by the SHAREHOLDER not suffering from such disability with the supporting diagnosis of two (2) different doctors with relevant experience selected by SHAREHOLDER not suffering from such disability.

"Final Disability Threshold" shall mean with respect to either SHAREHOLDER, she has been unable to perform the services for the CORPORATION required by this Agreement or in connection with her employment for the CORPORATION due to physical or emotional or mental incapacity or illness for 24 consecutive months or any 24 out of 30 months after a Disability first occurred. The determination as to whether a Final Disability Threshold has occurred shall be made by TEEMAN with the supporting diagnosis of two (2) different doctors with relevant experience selected by SHAREHOLDER NOT SUFFERING FROM SUCH DISABILITY.

"Person or person" shall mean any individual, corporation, joint venture, association, joint stock company, trust, limited liability company, foreign limited liability company, partnership (whether general or limited, domestic or foreign), estate, custodian, nominee or any other individual or entity in its own or any representative capacity, any unincorporated organization or government or other entity or political subdivision of any kind.

"Stock Percentage Ownership or Stock Ownership Percentage or Stock Percentage Interest" shall mean, at any relevant time, with respect to either SHAREHOLDER, expressed as a percentage, the number of shares of Stock issued and outstanding and owned by such Person divided by all of the issued and outstanding shares of Stock of the CORPORATION. Each SHAREHOLDER has a Stock Percentage Ownership of 50% on the date hereof.

"Triggering Event" means with respect to either SHAREHOLDER, her death, or if her employment with the CORPORATION is terminated for any reason.

JAN 23 2004 15:46 FR TANNENBAUM HELPERN 212 371 1084 TO 12123701218   P.13